BOLTON CORPORATION, Plaintiff v. T. A. LOVING COMPANY, Defendant

WILLIAM E. BOLTON, III, Plaintiff v. T. A. LOVING COMPANY, and BOLTON CORPORATION, Defendants

No. 8810SC1292

(Filed 5 July 1989)

**1. Contracts § 21.2; Negligence § 2— public building project— delay damages—statutory claim by one prime contractor against another**

Under N.C.G.S. § 143-128, a prime contractor on a public building project may be sued by another prime contractor on the project for economic loss foreseeably resulting from the first prime contractor's failure to fully perform all duties and obligations due respectively under the terms of the separate contracts. While plaintiff heating and air conditioning contractor had no claim for negligence against defendant general work contractor for delay damages, plaintiff did have a claim against defendant pursuant to N.C.G.S. § 143-128.

**2. Contracts § 21.2— public building project—contractor's claim against project expediter**

Under N.C.G.S. § 143-128, plaintiff heating and air conditioning contractor for a public building project may sue defendant general work contractor for breach of its contract duties as project expediter as well as for breach of its contract duties for general work not included in the other three prime contracts.

**3. Evidence § 47— responsibility for delay—competency of architect's testimony**

A public construction project architect's testimony concerning responsibility for delay should have been admitted since (1) opinion testimony was not inadmissible because it invaded the province of the jury, and (2) the parties had agreed by contract that the architect's opinion would be determinative of the issue.

**4. Contracts § 21.2— public building project—responsibility for delay—decision by architect prima facie correct**

Where a public building construction contract gives the architect the authority to determine responsibility for delay among the prime contractors, the architect's determination

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

is prima facie correct, and the burden is upon the other parties to show fraud or mistake.

**5. Contracts § 21.2 — public building project — extension of time — period of undue delay attributable to general contractor**

A change order granting the general work contractor for construction of a building at U.N.C. an extension of time of 150 days did not preclude the project architect from determining that the 150 days covered by that extension constituted a period of "undue delay" attributable to the general work contractor.

**6. Contracts § 29.3 — public building project — action by one contractor against another — undue delay — duration related losses**

Plaintiff heating and air conditioning contractor may present evidence of duration related losses resulting from undue delay caused by defendant general work contractor in the construction of a building for U.N.C. which prevented plaintiff from performing its work in a timely manner, including evidence of the costs of maintaining personnel, tools and equipment at the project site for the extended period.

**7. Contracts § 29.3 — public building project — undue delay — damages for home office overhead**

Damages for extended home office overhead may be allowed in an action by plaintiff heating and air conditioning contractor for a public building project to recover for undue delay by defendant general work contractor if they were contemplated in the contract and were incurred as a result of the undue delay caused by defendant.

**8. Contracts § 29.3 — public building project — undue delay by another contractor — recovery of subcontractor's delay damages**

In an action by a heating and air conditioning contractor to recover damages for delay allegedly caused by defendant general work contractor in the construction of a building for U.N.C., plaintiff could recover for delay damages incurred by its ductwork subcontractor since the subcontractor is viewed under the contract as a mere employee or agent of its prime contractor, and the contract intends for any damages to a subcontractor to be a subset of its prime contractor's damages.

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

### 9. Fraud § 12— failure to show intent to deceive

A prime contractor's forecast of evidence that defendant general work contractor and project expediter for a building project at U.N.C. circulated an overly optimistic work schedule used as a basis for bids by other prime contractors was insufficient to establish fraud by defendant where there was no evidence that the projected work schedule was circulated by defendant with the intent to deceive plaintiff or any other prime contractors who were bidding on the project.

### 10. Unfair Competition § 1— false work schedule—basis for bids by others—no unfair trade practice

Plaintiff prime contractor's evidence that defendant general work contractor and project expediter for a building project at U.N.C. circulated a 930-day work schedule used as the basis for bids by other prime contractors when it knew that the 930-day schedule was unrealistic did not show unscrupulous or immoral conduct by defendant which would constitute an unfair trade practice in violation of N.C.G.S. § 75-1.1.

APPEAL by plaintiff, Bolton Corporation, from *Read, Judge, Stephens, Judge,* and *Barnette, Judge.* Orders entered 2 November 1987, 19 January 1988 and 16 February 1988. Appeal by plaintiff, William E. Bolton, III, from *Barnette, Judge.* Orders entered 16 February 1988 and 23 February 1988 in Superior Court, WAKE County. Cross-appeal by defendant. Heard in the Court of Appeals 19 April 1989.

This "delay damages" case arises from a multiple-prime contract pursuant to N.C.G.S. § 143-128, to build a multi-million dollar central library on the UNC-Chapel Hill campus. Bolton, the heating and ventilating contractor, sued the general contractor and "project expediter," Loving, in negligence, and as a third-party beneficiary for breach of Loving's contract with the State. Bolton claims that Loving breached its contract with the State by causing Bolton "undue delay" which prevented Bolton from performing its contract in a timely way. Bolton initiated claims against Loving for delay damages and against the State of North Carolina. The claim against the State is before this panel in a connected case.

This case is before this Court for the second time. *Bolton v. Loving,* 77 N.C. App. 90, 334 S.E. 2d 495 (1985). On appeal from a decision of this Court, the Supreme Court in *Bolton v.*

## BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

*Loving*, 317 N.C. 623, 347 S.E. 2d 369 (1986), held that an insurance settlement did not preclude Bolton from pursuing its claims against Loving. On remand, Bolton pursued its claims for breach of contract, fraud, unfair and deceptive trade practices, negligent breach of common law duty of care, and breach of common law duty of due care in performance of a contract. Other pertinent facts are included below.

*Graham & James, by J. Jerome Hartzell and Mark Anderson Finkelstein, for plaintiff appellants and plaintiff appellees.*

*Poyner & Spruill, by David W. Long, Susan K. Nichols and David M. Barnes, for defendant appellant and defendant appellee.*

ARNOLD, Judge.

This action presents the following issues to this Court: (1) Was there sufficient evidence of negligence to preclude defendant's motion for directed verdict on that claim? (2) Is the contract provision which identifies Loving as project expediter valid? (3) Is the architect's allocation of responsibility for delay final, absent bad faith? (4) What theory of damages, and what evidence of damages may be presented? (5) When the State granted a change order for extension of time to Loving, what effect, if any, did that have on Bolton's claim against Loving for "undue delay"? (6) Was it error to allow summary judgment for defendant on plaintiff's claims for fraud, and unfair and deceptive trade practices?

In large public construction projects many factors may combine to prevent timely completion:

> [T]he complexity of design and quality construction which may be required, the myriad of necessary reviews and approvals, the number of changes required throughout the design/construction cycle, and the possibility of one or more of the contractors becoming delayed in performance . . . . Clearly, the necessity for effective scheduling, supervision, and coordination is at the heart of the phased design and construction method; and without it, the result may be akin to [a] "battlefield" . . . .

Conner, *Construction and Management Services* 46 Law & Contemp. Prob. 5, 14 (1983).

N.C.G.S. § 143-128 requires that when a public building project's expected costs exceed $50,000.00 "separate specifications must

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

be prepared, and separate bids must be received, and separate contracts must be awarded for each of four branches of work[:]" heating, ventilating and air conditioning (HVAC); plumbing and gas fittings; electrical wiring and installation; and general work not included in the first three branches. A. F. Bell, *Construction Law* North Carolina Bar Foundation IV-1 (Institute of Government 1988). The rationale in favor of multiple-prime contracts has been stated:

> While there can be additional bidding expenses, proponents of separate contracts also see cost advantages. Breaking down the project into specialty segments generates more bidders and more competition. Finally, some owners believe that they can reduce their costs by performing less expensively and at least as efficiently as the prime contractor. The latter earns part of her compensation for selection, policing, and coordination of the specialty trades.

J. Sweet, Sweet on Construction Industry Contracts § 19.2 at 372 (1987).

Bolton assigns error to the trial court's 16 February 1988 order granting a directed verdict to Loving on Bolton's negligence claim. In its defense, Loving mistakenly relies on *N.C. Ports Authority v. Roofing Co.*, 294 N.C. 73, 240 S.E. 2d 345 (1978), which teaches that a breach of contract does not ordinarily give rise to a tort action between the parties to a contract. Both parties miss an essential point, however—Bolton's cause of action is statutory:

> N.C.G.S. § 143-128. **Separate specifications for building contracts; responsible contractors.**
>
> \* \* \* \*
>
> *Each separate contractor shall be directly liable* to the State of North Carolina, or to the county or municipality, and *to the other separate contractors for the full performance of all duties and obligations due respectively under the terms of the separate contracts and in accordance with the plans and specifications, which shall specifically set forth the duties and obligations of each separate contractor.*

*See Bell* at IV-16. In compliance with the statute the contract states:

**BOLTON CORP. v. T. A. LOVING CO.**

[94 N.C. App. 392 (1989)]

Art. 12—Protection of Work, Property and the Public

The Contractors shall be jointly responsible for the entire site and the building or construction of the same and provide all the necessary protections, as required by the Owner or Engineer or Architect, and by laws or ordinances governing such conditions. They shall be responsible for any damage to the Owner's property, or of that of others on the job, by them, their men, or their sub-contractors, and shall make good such damages.

Art. 14—Construction Supervision

\* \* \* \*

All Contractors shall be required to cooperate and consult with each other during the construction of this project. Each Contractor shall lay out and execute his work so as to cause the least delay to other Contractors. Each Contractor shall be held responsible for any damage to other Contractors' work, and each Contractor shall be held financially responsible for undue delay caused by him to other Contractors on the project.

The parties to this suit did not contract one with the other, they are not promisee and promisor. Rather, each contracted with the owner, and in that contract each affirmed its statutory duty to be liable to the other for damage to the other's property or work. Because the parties are not promisee and promisor they are not bound by the limitations of *Ports Authority*.

[1] We interpret N.C.G.S. § 143-128 to mean that a prime contractor may be sued by another prime contractor working on a construction project for economic loss foreseeably resulting from the first prime contractor's failure to fully perform "all duties and obligations due respectively under the terms of the separate contracts."

A directed verdict in favor of Loving on the negligence claim was correct; however, Bolton does have a claim pursuant to the statute. On retrial, Bolton must provide sufficient evidence to support a cause of action under N.C.G.S. § 143-128.

To identify the extent of Loving's potential liability to Bolton it is necessary to understand what Loving's "duties and obligations" were under the terms of its separate contract. N.C.G.S. § 143-128. On appeal, both parties question the significance of the "project expediter" provisions of Loving's contract to Bolton's claim for

delay damages. On cross-appeal Loving argues that the trial court erred in refusing to grant its motion for a directed verdict on the ground that Loving could not be liable for failure to expedite because it "cannot be held liable for breach of a duty to coordinate the work of contractors." We disagree.

Loving's argument ignores the terms of the contract which separate the duty to coordinate from the duty to expedite, and assigns the duty to coordinate to the architect. The duty to coordinate derives from the owner's duty to "furnish a work site," and to cooperate to allow the contractor to perform. Goldberg, *The Owner's Duty to Coordinate Multi-Prime Construction Contractors, A Condition of Cooperation*, 28 Emory L.J. 377, 380-81 (1979). At common law "one who contracts to render a performance or produce a result for which it is necessary to obtain the cooperation of third persons is not excused by the fact that they will not co-operate." 6 Corbin § 1340 (1962). However, an owner's duty to cooperate and its ancillary duty to coordinate may be delegated in a contract. *Broadway Maintenance Corporation v. Rutgers*, 90 N.J. 253, 265, 447 A. 2d 906, 912 (1983).

At Articles 14 and 31 of the contract in the instant case each prime contracts to cooperate with the other primes in the execution of the project. In addition, Loving specifically contracted to assume the "project control responsibility" of project expediter:

Article 14 — Construction Supervision

The Owner may designate a "Project Expediter" for State-owned projects involving two or more prime contractors. . . .

It shall be the responsibility of the Project Expediter to schedule the work of all prime contractors; to maintain a progress schedule for all prime contractors for this project; and to notify the designer of any changes in the progress schedule.

By its terms the contract defines the project expediter as the entity which schedules the work of all primes and maintains the progress schedule. The project expediter is charged with using proper procedures to obtain information to evaluate the progress of the project. *See Goldberg* at 385-87. In Article 31 the contract states that the responsibility to coordinate work schedules remains with the engineer or architect. Article 14 contemplates that the project expediter's scheduling of the project will assist the ar-

BOLTON CORP. v. T. A. LOVING CO.

chitect, who has the power to sanction contractors who do not keep up with their work. *See Conner* at 14.

[2]  As General Contractor, Loving was responsible for "General work relating to the erection [and] construction" of the building not included in the three other prime contracts. N.C.G.S. § 143-128. As project expediter Loving's work was to facilitate and assist in the smooth and efficient production of the building. By statute Bolton may sue Loving for breach of these contract duties.

To prove Loving's liability Bolton attempted to establish that the architect's allocation of responsibility for delay was final, absent bad faith. By its order dated 2 November 1987, the trial judge denied Bolton's motion for partial summary judgment which, among other claims, stated that "[t]he architect was designated by the contract to rule on requests for extensions of time." Bolton's motion was denied, and it is not appealable. "Improper denial of a motion for summary judgment is not reversible error when the case has proceeded to trial and has been determined on the merits by the trier of facts, either judge or jury." *Harris v. Walden*, 314 N.C. 284, 286, 333 S.E. 2d 254, 256 (1985).

[3]  At trial, Bolton's attempt to introduce the project architect's testimony concerning responsibility for delay was refused by the trial judge because he saw the testimony as going to the ultimate issue for the jury. The testimony should have been allowed for two reasons: First, "the admissibility of expert opinion testimony does not depend on whether it invades the province of the jury, but whether it will aid the jury's understanding of the issue. . . ." *Pasour v. Pierce*, 76 N.C. App. 364, 369, 333 S.E. 2d 314, 317 (1985), *disc. rev. denied*, 315 N.C. 589, 341 S.E. 2d 28 (1986); *Alva v. Cloninger*, 51 N.C. App. 602, 612, 277 S.E. 2d 535, 541 (1981). Second, the parties had agreed by contract that the project architect's opinion would be determinative on the issue.

An authority on construction law posits that when a contract assigns the project architect or engineer responsibility to make decisions on all claims of contractors, as in this case, the architect's decision on responsibility for delay should control unless it is shown to be dishonestly made or to be clearly wrong. J. Sweet, Legal Aspects of Architecture, Engineering, and the Construction Process § 33.09 (3rd edition 1985). The rule is adopted from cases concerned with conditions precedent to payment. *See, e.g., Laurel Race Course, Inc. v. Regal Construction Co.*, 274 Md. 142, 333 A. 2d 319 (1975)

(engineer's certificate required before owner obligated to make payment); *Barnes Construction Co. v. Washington Township*, 134 Ind. App. 461, 184 N.E. 2d 763 (1962); *see* Restatement 2nd Contracts § 227 comment c.

In *Laurel*, the contractor sued the owner for amounts allegedly due under the contract. Owner defended that contractor had failed to produce the certification of the project engineer which would entitle it to payment under the terms of the contract. *Id.* Finding for the owner, the court stated:

> By this contract, which is perfectly lawful, the parties expressly agreed to submit the question . . . to the judgment of [a] third party, . . . [whose] judgment, no matter how erroneous or mistaken it may be, or how unreasonable it may appear to others, is conclusive between the parties', unless it be tainted with fraud or bad faith. To substitute for it the opinions and judgments of other persons, whether judge, jury or witnesses, would be to annul the contract, and make another in its place.

*Id.* at 151, 333 A. 2d at 325 (quoting *Lynn v. B.&O. R.R. Co.*, 60 Md. 404, 415 (1883).

*City of Durham v. Reidsville Engineering Co.*, 255 N.C. 98, 120 S.E. 2d 564 (1961), presents the rule in a somewhat different context. In *Durham*, the city sued a construction contractor for breach of its contract to provide power and light wiring on a public construction project. The construction contractor and its casualty insurer filed a cross-action against the supervising engineers who had certified the contractor's work, which made it eligible for payment. Interpreting contract documents similar to those in this case, the court held that when

> authority is expressly granted to the Engineers in the contract, together with their decision on all matters of dispute involving the character of the work, compensation for extra work, etc., the Engineers in making such decision under the terms of the contract would be acting in the capacity of arbitrators and could not be held liable in damages to either party in the absence of bad faith.

*Id.* at 102, 120 S.E. 2d at 567.

Articles 31 and 35 of Loving's contract allocates to the architect the authority to determine responsibility for delay among

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

the prime contractors. Article 31 of the contract concerns "Separate Contracts and Contractor Relationships":

Chapter 143, Article 8, General Statutes of North Carolina requires that separate contracts will be awarded for General Construction, Heating and Ventilating and Air Conditioning, Plumbing, and Electrical installations. The Owner reserves the right to prepare separate specifications, receive separate bids, and award separate contracts for such other major items of work as may seem to the best interest of the State.

All Contractors shall cooperate in the execution of their work, and shall plan their work in such manner as to avoid conflicting schedules or delay of the work. The Engineer or Architect shall coordinate work schedules.

If any part of a Contractor's work depends upon the work of another Contractor, defects which may affect that work shall be reported to the Architect or Engineer in order that prompt inspection may be made and the defects corrected. Commencement of work by a Contractor where such condition exists will constitute acceptance of the other Contractor's work as being satisfactory in all respects to receive the work commenced except as to defects which may later develop. The Engineer or Architect shall be the judge as to the quality of work, and shall settle all disputes on the matter between Contractors.

Whether the architect's allocation of responsibility for delay is final absent bad faith is largely answered by the last paragraph of Article 31. The subject of the paragraph as set out in the topic sentence is plain: when one prime's work depends on the work of another. When problems develop a report is to be made to the architect, otherwise the complaining prime will be deemed to have accepted the work of the prime whose work necessarily came first. Reading the paragraph as a whole, the last sentence explains that when the work of one prime depends on the work of another the "Architect shall be the judge as to the quality of work, and shall settle all disputes on the matter between Contractors." In this instance, to preclude the architect's testimony "would be to annul the contract."

Article 35 of the contract guides us in our determination of the proper weight to be accorded the architect's decisions:

Art. 35—Architect's or Engineer's Decisions

The Architect or Engineer is charged with the responsibility of interpretation of the contract documents and general directions of the work. He shall make decisions on all claims of the Contractor or the Owner, or on any matter dealing with the execution of the work. His decisions relating to artistic effect and technical matters shall be final, provided such decisions are within the limitations of the contract terms.

The architect interprets the contract which governs the relationship of the parties, and makes decisions on all claims of contractors "on any matter dealing with the execution of the work." Finality is accorded only to decisions relating to artistic effect and technical matters.

[4] As in any construction project, contractors in a multiple-prime situation co-exist in a delicate state of symbiosis. Each prime's ability to maintain timely progress is as much a part of their work, and is as important to the other primes, as their ability to perform more tangible tasks. We hold that judgment of the quality of a prime's ability to perform its jobs and to maintain timely progress in those jobs is delegated to the architect by the contract. The architect's determination is *"prima facie* correct, and the burden is upon the other parties to show fraud or mistake." *Barnes*, 134 Ind. App. at 466, 184 N.E. 2d at 764-65.

[5] In addition to the issue of project expediter liability addressed above, Loving contends on cross-appeal that it cannot be held liable to Bolton for any of the 411 day time extension allowed by the University. We disagree.

Loving's reliance on the rationale of *United States v. Rice*, 317 U.S. 61, 87 L.Ed. 2d 53, 63 S.Ct. 120 (1942), is misplaced. Rather, we rely on the terms of the contract in the instant case. At Article 18 the contract defines the project architect as:

the judge as to division of responsibility between the several Contractors, and shall apportion the amount of liquidated damages to be paid by each of them, according to delay caused by any or all of them.

Furthermore, Article 18 holds:

If any Contractor be delayed at any time in the progress of the work by any act or neglect on the part of . . . any

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

> other prime contractor on the work, . . . or by reason of which
> the Architect . . . considers delay justifiable, then the time
> of completion will be extended such period considered reasonable
> by the Architect . . . .

Loving correctly argues that Article 18 of the contract does not give the architect authority to decide delay disputes among the prime contractors. Article 18 is concerned with each prime's responsibility to the owner for delay. It is plain that the architect is the final judge as to apportionment of liquidated damages to the owner because of delay, and, as to when a prime should be granted a time extension from the owner because, in the architect's judgment, the prime has shown justifiable delay. However, given our interpretation of Article 31, Loving's reliance on Article 18 to shield it from liability for Bolton's delay claim is misplaced. Furthermore, an architect's decision under Article 18 would be relevant to a contractor's claim under Articles 31 and 35.

By letter dated 18 April 1984, Lesley N. Boney, Jr., project architect, made recommendations to the University's representative concerning liquidated damages on the library project. It was noted that the original completion time was 930 days, but actual completion time was 1,417 days. That due to change orders as of 18 April 1984 the total number of authorized completion days was extended to 1,191 days, leaving an overrun of 226 days for which liquidated damages were due from Loving. Boney closed his letter by stating that "no portion of the liquidated damages should be charged to the other contractors, and that the general contractor should be charged . . . for the delay in project completion." Subsequent to this decision by Boney, Loving negotiated a settlement with the University which resulted in change order G-29 which granted Loving a time extension of an additional 150 days, thus reducing the overrun to 76 days. Bolton was not a party to this settlement, and Boney only reluctantly approved the change order, with reservation, at the request of the University.

As stated above, the judgment of the quality of a prime's ability to perform its jobs, and maintain timely progress in those jobs, is delegated to the architect by the contract, and that determination is *prima facie* correct. The evidence suggests that Boney found the request for change order G-29 unjustifiable and unreasonable. It was only issued at the explicit direction of the University. Given these circumstances we find that G-29 does not

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

preclude the project architect from determining that the 150 days covered by that extension are a period of "undue delay."

Loving's argument that the Uniform Arbitration Act, N.C.G.S. § 1-567.1 *et seq.*, somehow lessens the power of the architect to settle disputes concerning cause for delay is also without merit. Loving correctly observes that the architect is not specifically made an arbitrator. The contract does not contemplate arbitration, and the parties are in no way bound to that procedure by the contract. However, the parties have agreed to be bound by the architect's judgments made under the powers given the architect in Articles 18, 31, and 35, and the correct forum to introduce such evidence is in a court of law.

Bolton assigns error to the trial court's exclusion of certain specific evidence of Bolton's delay damages, including the exclusion of evidence of extended "general conditions" expenses, that is, the cost of keeping tools and equipment on the site for the extended period; labor inefficiencies; invoice and actual cost records; home-office overhead; subcontractor's damages; and cost of delay in payment of retainage. Loving argues that the evidence was properly excluded because Bolton failed to tie its evidence of damages to any act or omission of Loving.

Article 12 of the contract makes each contractor liable for damage to another contractor's property; Article 14 makes each contractor "responsible for any damage to other Contractors' work, and each Contractor shall be held financially responsible for undue delay caused by him to other Contractors on the project." As stated above, the project architect's allocation of responsibility for undue delay is *prima facie* correct.

In breach of contract actions the injured party is entitled to be placed:

> in the same position he would have occupied if the contract had been performed. . . . Where one violates his contract he is liable for such damages, including *gains prevented* as well as *losses sustained*, which may fairly be supposed to have entered into the contemplation of the parties when they made the contract.

*Perfecting Service Co. v. Product Development & Sales Co.*, 259 N.C. 400, 415, 131 S.E. 2d 9, 21 (1963). In this case, N.C.G.S. § 143-128, by reference to the contract, contemplates that a contractor who

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

breaches his statutory duty to fulfill his contractual duties and obligations shall be liable for contract damages.

Contract damages are defined as either general damages, "damages that courts believe 'generally' flow from the kind of substantive wrong done by defendant," or special damages, those "peculiar to the particular plaintiff." Dobbs, *Remedies* § 3.2 (1973). Recovery of special damages is limited to those damages "which may reasonably be supposed to have been in the contemplation of the parties at the time they contracted." *Stanback v. Stanback*, 297 N.C. 181, 186, 254 S.E. 2d 611, 616 (1979) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. 145 (1854)). Although the parties here did not contract one with the other, the rule may be applied by showing what the parties knew at the time they contracted with the State.

Special damages must be proved to a reasonable certainty. " 'Absolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion.' " *Weyerhaeuser v. Godwin Building Supply*, 292 N.C. 557, 561, 234 S.E. 2d 605, 607 (1977) (quoting *Perfecting* at 417, 131 S.E. 2d at 22; *Tillis v. Cotton Mills*, 251 N.C. 359, 111 S.E. 2d 606 (1959)). However,

[w]here the plaintiff can prove the fact of damage, but not the extent of it, the reasonable certainty rule as it is now applied in most courts does not require proof of damages with mathematical precision. It does require that the plaintiff adduce some relevant datum from which a "just and reasonable" estimate of the amount might be drawn, and without any such datum in the evidence, the claim will necessarily be dismissed as speculative and conjectural. Beyond this, the plaintiff is probably expected to prove his damages with as much accuracy as is reasonably possible to him, but precision not attainable in the nature of the claim and circumstances is not ordinarily required.

*Dobbs* § 3.3 at 151 (1973) (cited with approval in *Largent v. Acuff*, 69 N.C. App. 439, 444, 317 S.E. 2d 111, 114, *disc. rev. denied*, 312 N.C. 83, 321 S.E. 2d 896 (1984)).

Damages for duration-related economic injury, that is, "maintaining required personnel, equipment and services at the project site . . . after the originally scheduled completion date" have been recognized by our Supreme Court. *Davidson and Jones, Inc. v.*

*N.C. Dept. of Administration*, 315 N.C. 144, 151, 337 S.E. 2d 463, 467 (1985). The method of proof of such damages is difficult:

> The data are not often, if ever, available in the specific detail that would allow a government contractor to price a loss of productivity claim based solely on actual cost data. To do so, it would be necessary for a government contractor to maintain detailed and complete records of each event contributing to the loss of productivity. Accomplishing this would require a cost-tracking system that specifically identifies each instance of additional cost caused by every individual action or inaction of the government. . . . [T]he cost of doing so [would be] prohibitive. The presentation of the proof of damages based upon the pricing of each increase in cost to every item of work, matched with the specific cause, cannot be practically realized in most situations. . . .
>
> . . . Generally, accounting and project records do not isolate the costs for productivity losses separately from the other costs of the project because the work affected by the loss of productivity is integral with the base contract work. There is no precise way to separate the normal or base work that is performed by an employee from the inefficient portion of the work.

Shea, *Proving Productivity Losses in Government Contracts*, 18 Public Contract Law Journal 414, 417-18 (March 1989) (citations to footnotes omitted).

[6] Bolton's items of damage labeled "general conditions" expenses and labor inefficiencies are analogous to the duration-related damages which were allowed to be proved in *Davidson and Jones*. On retrial, Bolton may, with the assistance of properly qualified expert testimony, introduce evidence of duration-related losses resulting from "undue delay" caused by Loving. The method of proof must be as specific as the circumstances will allow. *New Pueblo Constructors, Inc. v. State of Arizona*, 144 Ariz. 95, 696 P. 2d 185, 194 (1985) (Court discussed three methods of proving costs in delay damages cases: actual cost, jury verdict, total cost, and its derivative, modified total cost). Bolton must present whatever evidence is available to tie the loss to the period of "undue delay" attributable to Loving, and, "must also demonstrate why better or more certain evidence is not obtainable." *Shea* at 430.

**BOLTON CORP. v. T. A. LOVING CO.**

[94 N.C. App. 392 (1989)]

A review of the record shows that evidence of invoice and actual cost records was refused because the trial court was convinced that the evidence offered included evidence from other jobs, not just this job. On retrial, the burden is on Bolton to make this evidence intelligible to the court and to explain why better and more certain evidence is not obtainable.

[7] Damages for extended home-office overhead may be allowed if they are contemplated in the contract, *Davidson and Jones* at 156, 337 S.E. 2d at 470, and, in this case, if they can be shown to be related to costs incurred as a result of the "undue delay" caused by Loving. *See Perfecting* at 417, 131 S.E. 2d at 22.

[8] Bolton correctly contends that the trial court erred in refusing to allow evidence of damages incurred by Bolton's ductwork subcontractor, Phillips. Article 32 of the contract establishes these attributes of the relationship between contractors and subcontractors:

The Contractor is and remains fully responsible for his own acts or omissions as well as those of any sub-contractor or any employee of either. The Contractor agrees that no contractual relationship exists between the sub-contractor and the Owner in regard to this contract, and that the sub-contractor acts on this work as an agent or employee of the Contractor.

Article 33 states:

The Contractor agrees that the terms of these contract documents, including all portions thereof, apply equally to a sub-contractor as to the Contractor, and that the sub-contractor is bound by those terms as an employee of the Contractor.

Article 12 states:

[Contractors] shall be responsible for any damage to the Owner's property, or of that of others on the job, by them, their men, or their sub-contractors, and shall make good such damages.

A contractor may recover from an owner its subcontractor's "extra costs and services wrongfully demanded" when the subcontractor is not in privity with the owner and could not recover directly. *United States v. Blair*, 321 U.S. 730, 737, 88 L.Ed. 1039, 1045, 64 S.Ct. 820, 824 (1944); *see also Wexler v. Housing Authority*, 149 Conn. 602, 606, 183 A. 2d 262, 265 (1962). The rule is explained:

The government [owner] did not have, and did not by any implication recognize, any contractual relations whatever with

[subcontractor], and if he had failed in performing it would not have had any right of action against him . . . . [Contractor] was the only person legally bound to perform the original contract; it was from him that the government demanded the extra service, and under the facts found by the lower court the obligation to pay for that service was to him, whether he performed it personally or through another.

*Hunt v. United States*, 257 U.S. 125, 128-29, 66 L.Ed. 163, 165, 42 S.Ct. 5, 6 (1921).

In the instant case the issue is whether one prime on a multiple-prime project may sue another prime for damages incurred by the first prime's subcontractor. Though not answering the question directly, our Supreme Court in *Davidson and Jones* allowed a prime to recover duration-related damages related to work performed by a subcontractor. *See also J. A. Tobin Construction Co. v. State Highway Commission*, 680 S.W. 2d 183, 191 (Mo. App. 1984) (contractor may include as part of its claim the amount due a subcontractor, provided that portion of the contractor's claim is not based on speculation and is liquidated).

As set out above, both N.C.G.S. § 143-128 and the contract make contractors liable one to the other for damages. Article 31 of the contract imposes a duty of cooperation on all contractors, and states that when one contractor's work depends on the work of another the "Architect shall be the judge as to the quality of work, and shall settle all disputes on the matter between Contractors." There is no privity of contract between the subcontractor and the owner, nor the subcontractor and the other primes. The subcontractor is viewed under the contract as a mere employee or agent of the prime contractor.

Loving cites *Warren Brothers Co. v. N.C. Dept. of Transportation*, 64 N.C. App. 598, 307 S.E. 2d 836 (1983), and *Ledbetter Brothers v. Department of Transportation*, 68 N.C. App. 97, 314 S.E. 2d 761 (1984), in support of its argument that Bolton cannot assert damages suffered by Phillips. These cases are inapposite. Unlike those cases, the contract here makes each contractor "financially responsible for undue delay caused by him to other Contractors on the project." Furthermore, as set out above, each contractor is fully responsible for the acts of its subcontractors. If a subcontractor were to cause injury to a contractor other than its prime, the other contractor would have an action in contract against the

**BOLTON CORP. v. T. A. LOVING CO.**

[94 N.C. App. 392 (1989)]

subcontractor's prime. The logic set out in *Hunt* is applicable here, and we hold that the contract intends for any damages to a subcontractor to be a subset of its prime's damages. In light of this ruling we do not reach the issues raised in the appeal of William Bolton, III.

Finally, Bolton alleges that it should be allowed to prove the cost of delay in payment of retainage. This argument is without merit.

[9] In its order dated 19 January 1988, the trial court allowed Loving's motion for summary judgment as to the fraud and unfair trade practices claim. We affirm.

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.R. Civ. P. 56, *Singleton v. Stewart*, 280 N.C. 460, 186 S.E. 2d 400 (1972).

To withstand a motion for summary judgment on a fraud claim, the forecast of the evidence must present a genuine issue of material fact as to each element of fraud. *Uzzell v. Integon Life Insurance Corp.*, 78 N.C. App. 458, 463, 337 S.E. 2d 639, 643 (1985), *cert. denied*, 317 N.C. 341, 346 S.E. 2d 149 (1986). Summary judgment "is proper where the forecast of evidence shows that even one of the essential elements of fraud is missing." *Id.*

The elements of fraud have been stated:

(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) *made with intent to deceive*, (4) which does in fact deceive, (5) resulting in damage to the injured party.

*Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 569, 374 S.E. 2d 385, 391 (1988), *citing Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E. 2d 494, 500 (1974).

As the court in *Myers & Chapman* points out a more traditional formulation of the elements of fraud is:

(a) that the defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it defendant knew it was false *or made it recklessly without any knowledge of its truth and*

*as a positive assertion*; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury.

*Id.* at 568, 374 S.E. 2d at 391, *citing Odom v. Little Rock & I-85 Corp.*, 299 N.C. 86, 92, 261 S.E. 2d 99, 103 (1980). The court disapproved this formulation of the elements of fraud to the extent it suggests that the essential element of the intent to deceive need not be shown. *Id.* at 569, 374 S.E. 2d at 392. Specifically, the court rejected the idea that "it is unnecessary to prove intent to deceive because intent may be inferred by reckless indifference to the truth." *Id.* at 567, 374 S.E. 2d at 391.

Loving argues that Bolton's forecast of the evidence on the issue of fraud failed to present a genuine issue of material fact on the issue of intent to deceive. Paraphrasing, Bolton's complaint on the issues of fraud and unfair and deceptive trade practice states: (1) at the time Loving executed its contract with the State "it knew that it would not be able to finish its work under the contract within 30 months, but rather that it would require a substantially greater time"; (2) Loving did not disclose to the other primes its true estimate of the timing of the project, but rather circulated a work schedule based on 30 months; (3) that this was done with the intention and expectation that the other contractors would rely on the misconceived and erroneous work schedule; and (4) Bolton reasonably relied on this schedule in forming its bid.

In support of its contentions, Bolton presented a series of five letters from Loving to the project architect: 11 July 1980: "We have had reservations all along as to whether 930 days is enough time to build this job"; 19 January 1981: "In order to set the record straight, it is noted that you were advised in the Pre-Bid Conference on August 3, 1979, and several telephone conversations, that the nine hundred thirty (930) days were unrealistic." 13 October 1981: "We are trying our best to build this 36-month job in 33 months. The time allotted is approximately thirty (30) months."

Other evidence presented included a deposition of William Franklin, one of Loving's project estimators, who stated that given the magnitude of the job nine hundred and thirty days was unrealistic, but "if everything went as it should and as best it could, the job could have been built in nine hundred and thirty days."

BOLTON CORP. v. T. A. LOVING CO.

[94 N.C. App. 392 (1989)]

Even assuming that Loving *knew* that the work schedule was a false representation of the true nature of the project, which we are not certain the evidence suggests, there is no evidence in the record that the projected work schedule was circulated with the intent to deceive Bolton, or any other prime. *Cf. E. C. Nolan Co. v. State of Michigan*, 58 Mich. App. 294, 227 N.W. 2d 323 (1975) (plaintiff entitled to recover when work-progress schedule was at variance with the facts, amounted to a material misrepresentation, and plaintiff had a right to rely on the schedule). It is undisputed that the contract provided for extensions of time, that Bolton was an experienced contractor who would be aware of the fact that "projected completion dates in the construction industry are often missed for a variety of reasons and may be impossible or impractical to fulfill." *Opsahl v. Pinehurst, Inc.*, 81 N.C. App. 56, 70, 344 S.E. 2d 68, 77, *cert. granted*, 318 N.C. 284, 347 S.E. 2d 465 (1986), *disc. rev. improvidently allowed*, 319 N.C. 222, 353 S.E. 2d 400 (1987). We agree with the trial court that the forecast of the evidence failed to support Bolton's contention that Loving intended to deceive the other primes who were bidding on the job.

[10] In contrast to fraud, intent is irrelevant to a claim of unfair and deceptive trade practices under N.C.G.S. § 75-1.1. *Wilder v. Squires*, 68 N.C. App. 310, 315 S.E. 2d 63 (1984). Rather, "unfairness and deception are gauged by consideration of the effect of the practice on the marketplace. . . ." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E. 2d 397, 403 (1981). Whether a particular act is unfair or deceptive is a question of law for the court. *Opsahl.* It is the province of the jury to find the facts of the case. *Love v. Pressley*, 34 N.C. App. 503, 516, 239 S.E. 2d 574, 583 (1977), *cert. denied*, 294 N.C. 441, 241 S.E. 2d 843 (1978).

In *Opsahl*, this Court analyzed the Supreme Court's opinion in *Johnson v. Insurance Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980), and found that whether an action lies under N.C.G.S. § 75-1.1 can be identified by following these guidelines:

"The concept of 'unfairness' is broader than and includes the concept of 'deception.'" *Johnson, supra*, 300 N.C. at 263, 266 S.E. 2d at 621. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* Specifically, "[a] party is guilty of an unfair act or practice when it engages in conduct which amounts to an

inequitable assertion of its power or position." *Id.* at 264, 266 S.E. 2d at 622. "An act or practice is deceptive . . . if it has the capacity or tendency to deceive." *Id.* at 265, 266 S.E. 2d at 622. "In determining whether a representation is deceptive, its effect on the average consumer is considered." *Id.* at 265-66, 266 S.E. 2d at 622.

*Opsahl* at 69, 344 S.E. 2d at 76.

Chapter 75 protects against injury to businesses as well as individual consumers. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 665, 370 S.E. 2d 375, 389 (1988). In a business context, whether a representation is deceptive may be decided by considering its effect on the average businessperson. *See Opsahl.*

We are asked to decide whether by circulating to the other primes a projected work schedule based on 930 days, when it knew that a 930-day schedule was at best overly optimistic, if not impossible, Loving engaged in deceptive conduct which amounted to an inequitable assertion of its power or position as General Contractor. Given the guidelines set out above, an assertion of power is inequitable and within the scope of N.C.G.S. § 75-1.1 if it "offend[s] public policy . . . [is] immoral, unethical, unscrupulous, or substantially injurious . . . ." *Opsahl.*

In *Opsahl*, this Court affirmed the trial court's refusal to recognize an action under N.C.G.S. § 75-1.1 when the plaintiff house buyers alleged that they entered into a real estate contract with the defendant based on completion dates that the defendant represented as firm. As stated above, the court in that case charged the consumer plaintiffs with "the knowledge that projected completion dates in the construction industry are often missed for a variety of reasons and may be impossible or impractical to fulfill." *Id.* at 70, 344 S.E. 2d at 77. Bolton, too, as a professional contractor, is charged with this knowledge. We hold that Loving's circulation of the 930-day schedule as a basis for bids to other professional contractors did not rise to the level of unscrupulous, immoral conduct.

We have examined the parties' remaining contentions and have determined it is unnecessary to address them since they may not recur at retrial.

Affirmed in part, and reversed in part and remanded for a

New trial.

Judges GREENE and LEWIS concur.