W. E. GARRISON GRADING COMPANY v. PIRACCI CONSTRUCTION CO., INC.

No. 7514SC490

(Filed 17 December 1975)

1. Contracts § 18— written contract — modification by parol agreement

The provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived; therefore, the trial court could properly find that a contract between the parties which provided that no extra work would be paid for unless authorized in writing was modified by a subsequent oral agreement between plaintiff and defendant concerning the unit prices of borrow and mucking excavation and by defendant's conduct since work was performed at the request and under the supervision of defendant's engineer.

2. Contracts § 20— failure of plaintiff to perform contract — performance prevented by defendant

In an action for breach of contract to grade a building site, defendant's contention that the quantity of excavation for which plaintiff is entitled to compensation should be based solely on cross-section calculations as prescribed by the parties' contract is without merit where defendant, by changing stake-outs as the work progressed and by failing to provide requisite engineering, made it impossible to measure accurately the amount of excavation by the cross-section method.

APPEAL by defendant from *Canaday, Judge.* Judgment entered 20 February 1975 in Superior Court, DURHAM County. Heard in the Court of Appeals 24 September 1975.

This appeal stems from a civil action brought by plaintiff for breach of contract.

Plaintiff's evidence tends to show the following: W. E. Garrison, president and owner of W. E. Garrison Grading Company, is an experienced grading contractor who works principally in the Raleigh area. Defendant, Piracci Construction Co., Inc., owned property in the Research Triangle and was employed to construct the National Air Pollution Control Administration Building thereon. In June of 1969 Garrison and a representative of defendant entered negotiations concerning the grading requirements for the building project. During the summer plaintiff prepared two proposals based on site plans furnished by the defendant. The unit prices of various types of grading work were the same in each proposal:

    a. Clearing — $350.00 per acre;

    b. Topsoil stripped — 30¢ per yard;

    c. Ripped excavation — $1.05 per yard;

    d. General excavation — 45¢ per yard;

    e. Borrow needed — 65¢ per yard;

    f. Shaping site — $7,000.00.

In early September, pursuant to defendant's instructions, plaintiff began clearing the construction site with the understanding that it would proceed with the grading work once a final plan was approved. At a 10 September 1969 meeting in Baltimore, Maryland, the parties agreed that plaintiff would perform the remainder of the site work according to a final site plan. The plan embodied plaintiff's earlier suggestion that the elevations in the first proposed plan be lowered one foot to create a "balance" between excavation and filling operations and, in effect, eliminate the need for waste and borrow operations. It was also agreed that excavation would be based on cut rather than fill and that the work performed by plaintiff would conform to the following estimates:

    a. Clearing — 26 acres at $350.00 per acre;

    b. Stripping — 29,400 cubic yards of topsoil at 30¢ per cubic yard;

    c. General excavation — 120,000 cubic yards at 45¢ per cubic yard;

d. Ripped excavation — 36,000 cubic yards at $1.05 per cubic yard;

e. Shaping site — a lump sum of $7,000.00.

Thereafter plaintiff commenced the grading operations under the supervision of defendant's employees. Plaintiff periodically billed defendant for work performed through 11 December 1969, and defendant promptly paid the first three invoices. Meanwhile plaintiff encountered unexpected borrow work and extensive mucking operations and erroneously listed 34,000 cubic yards of borrow excavation as general excavation at 45¢ per cubic yard in the 11 December invoice. In order to obtain the full 65¢ per cubic yard price for borrow excavation, plaintiff added 20¢ per cubic yard for the 34,000 cubic yards previously billed as general excavation to the next invoice dated 31 December. Defendant refused to pay the 31 December invoice because of questions regarding the amount and price of the borrow and mucking work. By letter dated 2 January 1970 plaintiff attempted to explain the reason for the overruns, and defendant paid the 11 December invoice at the end of January. During the interim period plaintiff signed a standard form contract, dated 5 January, at the request of defendant. The unit prices for clearing, stripping, general excavation, ripped excavation, and grading set forth in the written agreement were identical to the rates of the September agreement. The contract did not specify a unit price for borrow or mucking operations. Furthermore, the contract contained the following provisions:

"NO EXTRA WORK SHALL BE PAID FOR UNLESS AUTHORIZED IN WRITING FROM OWNER'S OFFICE. VERBAL AUTHORIZATION SHALL NOT BE RECOGNIZED.

.  .  .  .

"Owner shall furnish a qualified engineer for all required line and grade, surveys and levels as necessary. *Contractor shall prepare all required cross-sections and calculations, verify and check with job representative for purposes of evaluating quantities of various materials involved.* Contractor will review with Superintendent and determine quantities for requisition purposes." (Emphasis added.)

Plaintiff continued to perform borrow and mucking work in excess of the original estimates due to defendant's substantial deviation from the final site plan. At a 7 February 1970 meet-

ing the parties verbally agreed that plaintiff would be paid $2.50 per yard for mucking and $.65 per yard for borrow operations and that general excavation over 86,000 yards would be considered borrow for payment purposes. Defendant promptly paid plaintiff for the borrow and mucking work set forth in the 31 December invoice and subsequently paid a 15 July invoice for similar operations. Although plaintiff continued to perform work for defendant until the end of October, defendant refused to make further payments.

Defendant's evidence tends to show that it did not agree to pay plaintiff 65¢ per cubic yard for borrow excavation at the 7 February meeting. The focus of that meeting was limited to the extra work billed in the 31 December invoice. The executive of Piracci Construction Co., Inc., who met with plaintiff testified, " . . . I am not sure whether I agreed to compensating that day or take it under advisement and think about it, but I definitely can state that I had no intention of establishing a new unit price for borrow excavation." At most defendant agreed to pay 20¢ per yard for the borrow excavation reflected in the 31 December invoice.

At the pretrial conference the parties agreed to the following stipulations:

" . . . the primary difference or differences between the parties hereto revolves around the quantities of materials to be paid for. The plaintiff contends that it has been underpaid for materials moved under its contract or contracts with the defendant and the defendant contends that the plaintiff has been overpaid for materials moved under a contract or the contract.

"The defendant contends that there is a discrepancy in the billings but the plaintiff contends that the final billing and the final amount is correct except as will be amended during the course of the trial.

"The primary matters to be decided by the court are as follows:

"1. What contracts, if any, existed between the parties?

"2. The volume of materials moved by the plaintiff on the construction project;

"3. The price of the materials moved by the plaintiff on the project."

The case was tried without a jury, and judgment in the amount of $80,109.25 was rendered for plaintiff. Defendant appeals.

*Nye, Mitchell & Bugg, by Charles B. Nye, for plaintiff.*

*Dees, Johnson, Tart, Giles & Tedder, by J. Sam Johnson, Jr., for defendant.*

BROCK, Chief Judge.

To quote from defendant's brief, "All of the error which the Defendant assigns relates to this fundamental question: What was the contract between the parties, and did the Plaintiff prove liability under that contract?" In particular defendant contends that the presiding judge erred by not limiting its liability to excavation work performed by plaintiff which was (1) authorized by written change order and (2) measured by the cross-section method in accordance with the express terms of the 5 January contract. The essence of defendant's argument is that the 5 January contract exclusively governs its liability to plaintiff.

[1] The presiding judge found that the written order procedure of the 5 January contract was modified by the subsequent oral agreement between plaintiff and defendant concerning the unit prices of borrow and mucking excavation. This finding is supported by competent evidence. Furthermore, it is apparent that the so-called "extra" borrow and mucking work was performed at the request and under the supervision of defendant's engineer. "The provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived. . . . This principle has been sustained even where the instrument provides for any modification of the contract to be in writing. (Citations omitted.)" *Graham and Son, Inc. v. Board of Education,* 25 N.C. App. 163, 212 S.E. 2d 542 (1975). Applying this principle to the facts in this case, we hold that the presiding judge properly found defendant liable as a result of its oral agreement with plaintiff and its subsequent conduct.

[2] Even if deemed liable for borrow and mucking operations, defendant argues that the quantity of excavation for which

Grading Co. v. Construction Co.

plaintiff is entitled to compensation should be based solely on cross-section calculations as prescribed by the 6 January contract. Again this argument is a casualty of the court's findings of fact:

"28. Upon the completion of work, the parties attempted to arrive at agreed quantities and in this connection jointly approved a final survey or cross-section of the completed works. [The parties could not agree that the final cross-section was an adequate measure or basis to determine the amount or quantity of work performed by comparing it with the original cross-section made before work was commenced, and the Court finds as a fact that the final cross-section of the completed work could not and would not be a proper basis of measurement for the work actually performed by the plaintiff in part because of:

"a. The final approved cross-section made after the completion of all work would not reflect the shrinkage in the fill areas after compaction.

"b. A comparison between the original and final cross-section in the fill areas would not correctly reflect the amount of top soil replaced in the fill areas and would not reflect accurately the mucking or top soil operations. Neither would a comparison of the cross-sections have any bearing on the materials in the fill areas which had to be removed more than once as borrow operations. Neither would the two cross-sections reflect or measure the amount of work required by the constant restaking of the project and changing of grades made by the defendant during the period that the construction work was being performed.

"Therefore, based upon all the testimony and evidence, the Court finds as a fact that the measurement of the actual quantities of material moved by the plaintiff must be based on some other method of measurement other than by use of a comparison of the original and final cross-sections of the plaintiff's work because of the foregoing and because there was no interim engineering work for evaluating quantities.]

"[29. That the plaintiff offered uncontested testimony and evidence that the only reasonable and prudent way to determine the quantities or volume of materials moved by the plaintiff on the construction project was, in the last

analysis, based on load counts which the plaintiff kept on a daily basis during the construction of the project; that the plaintiff's evidence and testimony reflects the fact that all of its billings from start to finish concerning general and borrow excavation were based on load counts and the evidence tends to show, and the Court finds as a fact, that from the inception of the contract until its completion, the majority of its billings, if not all billings, were based on load count due to lack of engineering on behalf of the defendant; that the Court further finds it a fact that measurements made by load count are reasonably correct, are accepted in the trade as being reasonably certain and are a proper basis for determining the quantities of work performed by the plaintiff on the subject project because of the lack of interim engineering performed by the defendant and because of the plaintiff's being forced into an unbalanced project because of the defendant's failure to stake out the project properly on numerous occasions.]"

In summary, due to changes in the stake-outs as the work progressed and defendant's failure to provide the requisite engineering, it was not possible to accurately measure the amount of excavation by the cross-section method. "It is a salutary rule of law that one who prevents the performance of a condition, or makes it impossible by his own act, will not be permitted to take advantage of the non-performance. (Citations omitted.)" *Mullen v. Sawyer,* 277 N.C. 623, 178 S.E. 2d 425 (1971).

Defendant assigns error to the relief granted to plaintiff on the grounds that it is based upon *quantum meruit.* The presiding judge's conclusions of law clearly indicate that plaintiff's relief is derived not from *quantum meruit* principles but from "its contracts and agreements with the defendant under the conditions of the contracts and agreements or under the conditions of the contracts and agreements as waived or under the conditions as ratified and affirmed by the defendant. . . ." This assignment of error is overruled.

In the pleading stage of the trial defendant answered with a counterclaim to the effect that the cross-sections taken after the grading work had been completed indicate that plaintiff

was overpaid. During trial defendant's attorney made the following statement to the trial judge:

> "Your Honor, as I indicated before the luncheon recess, Mr. Rupp has asked to speak, or maybe before he begins his testimony with reference to the counterclaim. We have discussed it during lunch and I have told him that in our written contract, specifically paragraph 9.7.5 the statement is made 'The making of final payment shall constitute a waiver of all claims by the owner except those arising from . . .' various matters that are not at issue here, and that in view of our position in this case that final payment has been made, that it would be both inconsistent and right that we not put in evidence of our counterclaim, and so that is the decision of the defendant consistent with its view of the contract, and therefore I would not introduce any evidence through Mr. Rupp of the counterclaim."

Defendant assigns error to the court's finding that defendant voluntarily agreed to the dismissal of its counterclaim. If we should determine that the trial judge erroneously found that defendant voluntarily dismissed its counterclaim, it would afford defendant no relief. At best, the difference between defendant's statement to the trial court and a voluntary dismissal of the counterclaim is technical. Most outstanding, however, are the pretrial stipulations of the questions to be resolved by the trial court. Each of these questions was resolved upon the evidence offered at trial. None of them is affected by the existence or non-existence of defendant's counterclaim. We fail to see prejudicial error, if error exists, in the recitation in the judgment that defendant had voluntarily stipulated that its counterclaim be dismissed. Defendant had the burden of proof upon its counterclaim, but by its own election it offered no evidence to substantiate its claim. Under such circumstances we fail to see how defendant can suggest that its counterclaim still exists.

Affirmed.

Judges VAUGHN and MARTIN concur.