APAC-CAROLINA, INC. AND UNITED SPRINKLER, INC., PLAINTIFFS-APPELLANTS v. GREENSBORO-HIGH POINT AIRPORT AUTHORITY AND SOUTHERN MAPPING & ENGINEERING COMPANY, DEFENDANTS-APPELLEES

No. 9218SC29

(Filed 6 July 1993)

1. **Contracts § 114 (NCI4th); Public Works and Contracts § 57 (NCI4th) — airport taxiway extension — general contractor — no standing to assert claim for subcontractor**

    The general contractor had no standing to assert a claim for additional payment against an airport authority on behalf of a grading subcontractor where the subcontractor had no claim against the authority because there was no privity of contract, the subcontractor was not a third-party beneficiary of the contract between the general contractor and the authority, the contract was not assigned to the subcontractor, no liens have been asserted by the subcontractor, and the contract provides that "the owner will not recognize any subcontractor on the work."

    **Am Jur 2d, Contracts §§ 294-297; Public Works and Contracts §§ 102-104.**

2. **Contracts § 172 (NCI4th); Highways, Streets, and Roads § 46 (NCI4th) — undercut work not extra work**

    Undercut work performed by plaintiff contractor in constructing an airport taxiway extension was not "extra work" under the contract with the airport authority where it is clear from the contract language that undercut work was to be treated as unclassified excavation and paid for as such. Thus, plaintiff was entitled to be paid for undercut at the same rate as for all unclassified excavation.

    **Am Jur 2d, Building and Construction Contracts §§ 76-86; Public Works and Contracts §§ 185-198.**

3. **Contracts § 172 (NCI4th) — amount of unclassified excavation — issue of material fact**

    Plaintiff contractor's evidence indicating potential errors in defendant airport authority's measurements of the amount of unclassified excavation in a taxiway extension project by using the average end area method specified in the contract

was sufficient to raise a genuine issue of material fact with respect to the amount of unclassified excavation and entitled plaintiff to present evidence of the measurements it obtained using the load count method.

**Am Jur 2d, Building and Construction Contracts §§ 76-86.**

4. **Contracts § 172 (NCI4th); Highways, Streets, and Roads § 46 (NCI4th)— airport taxiway project—extra erosion control work—no recovery under breach of warranty theory**

Plaintiff contractor was not entitled to recover for extra erosion control work it performed on an airport taxiway extension project under a breach of implied warranty theory based on its contention that the defendant airport authority's plans and specifications contained inadequate erosion control measures and were thus not suitable for the purpose for which they were intended where the contract required plaintiff to comply with environmental laws and regulations and placed the burden of compliance on plaintiff; although the plans and specifications set forth environmental requirements, the contract clearly stated that laws and regulations prevailed over contract provisions; the contract gave the airport authority the right to direct plaintiff to perform erosion control work not specified in the contract; and the contract did not entitle plaintiff to extra payment for erosion control work but contemplated that the cost of such work was to be included in the unit price for excavation.

**Am Jur 2d, Building and Construction Contracts §§ 76-86; Public Works and Contracts §§ 185-198.**

5. **Contracts § 172 (NCI4th); Highways, Streets, and Roads § 47 (NCI4th)— airport taxiway project—unanticipated undercut and erosion control—wet weather—no-damages-for-delay clause**

The no-damages-for-delay clause of an airport taxiway extension contract prohibited plaintiff contractor from recovering increased costs allegedly caused by delays from unanticipated undercut and erosion control work since (1) the airport authority did not order the delay, and (2) the delay was not due to "some unforeseen cause not provided for in the contract" because the undercut and erosion control work was provided for in the contract. Furthermore, delay due to wet weather was also precluded by the no-damages-for-delay clause.

**Am Jur 2d, Building and Construction Contracts §§ 76-86; Public Works and Contracts §§ 161-169.**

### 6. Damages § 60 (NCI4th) — validity of liquidated damages clause

A liquidated damages clause in an airport taxiway construction contract was valid and enforceable when undercut work did not constitute extra work and defendant airport authority thus did not contribute to a delay in the project by ordering such work to be performed, and plaintiff contractor presented no evidence that the damages were unreasonable or punitive in nature. However, plaintiff contractor was entitled under the contract to an increase in the contract time if undercut work exceeded the proposal estimate.

**Am Jur 2d, Damages § 683.**

### 7. Negligence § 102 (NCI4th) — airport runway extension project — amount of undercut — negligent misrepresentation — no justifiable reliance

Plaintiff contractor and plaintiff grading subcontractor were not entitled to recover from defendant engineering firm for negligent misrepresentation of the amount of necessary undercut work in the plans and specifications of an airport taxiway extension project because there was no justifiable reliance by plaintiffs where (1) the plans and specifications discussed the potential undercut work, the contract addressed undercut work, and plaintiffs did not fully inspect the available information, and (2) the contract clearly stated that any quantities mentioned therein were merely estimates.

**Am Jur 2d, Negligence § 307 et seq.**

Appeal by plaintiffs from judgment entered 16 August 1991 by Judge Russell G. Walker, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 14 December 1992.

*Patton, Boggs & Blow, by Robert G. McIver and C. Allen Foster, for plaintiffs-appellants.*

*Smith Helms Mulliss & Moore, by Stephen P. Millikin and James W. Barkley, and Cooke & Cooke, by Barden W. Cooke, for defendant-appellee Greensboro-High Point Airport Authority.*

**APAC-CAROLINA, INC. v. GREENSBORO-HIGH POINT AIRPORT AUTHORITY**

[110 N.C. App. 664 (1993)]

*Frazier, Frazier & Mahler, by Harold C. Mahler and James D. McKinney, for defendant-appellee Southern Mapping & Engineering Company.*

LEWIS, Judge.

APAC-Carolina, Inc. ("APAC"), a business engaged in paving highways and airports, served as general contractor for the extension of a runway and construction of a taxiway (the "Project") at the Greensboro-High Point Airport. United Sprinkler, Inc. ("Sprinkler") was a subcontractor on the Project. On 1 September 1989 APAC and Sprinkler filed a complaint against defendants Greensboro-High Point Airport Authority ("Authority") and Southern Mapping and Engineering Company ("Southern"), an engineering and surveying business which prepared plans, specifications and estimates for the project. Plaintiffs alleged, among other things, nonpayment of claims for undercut excavation work which was neither contemplated by the contract nor mentioned by defendants. Both defendants filed answers on 14 November 1989. On 3 August 1991 defendants filed motions for summary judgment, and on 14 August 1991 plaintiffs filed a cross-motion for partial summary judgment. On 16 August 1991 Judge Walker denied plaintiffs' motion and granted defendants' motions for summary judgment. Plaintiffs now appeal from this order.

In June 1986 APAC submitted a bid proposal for the Project to Authority. APAC's proposal included a contract price of $1.99 per cubic yard of unclassified excavation for an estimated 167,200 cubic yards. It did not include a price for undercut, replacement, or compaction work as such.

APAC, as the low bidder, was awarded the contract on 26 August 1986. The contract provided for completion in 120 calendar days. It also stated that all soil removal or undercutting would be included in the broader category of "unclassified excavation" for contract purposes, to be paid at the rate per cubic yard for that item. APAC had bid a price of $1.99 per cubic yard for all unclassified excavation.

APAC subcontracted with Sprinkler, a grading and excavation business, to do the grading work. Shortly after Sprinkler began work in September 1986, Southern directed APAC and Sprinkler to undercut the taxiway subgrade to "substantial depths." When it became apparent that a "substantial volume" of undercutting

would be required for the Project, Sprinkler protested that such work was not contemplated in the plans and specifications, was not a contract-pay item, and was more complicated, time-consuming and expensive than the work estimated to be $1.99 per cubic yard. In response to Sprinkler's indication that it would seek additional compensation for the work, Southern threatened to shut-down the job and impose liquidated damages of $1,000.00 a day. Plaintiffs performed the work under protest.

Sprinkler measured its excavation work using load counts, although the contract specified another method. Relying on the load counts, Sprinkler claims it performed more excavation than the amount recorded and paid for by Authority. Plaintiffs allege performance of this "extra" work caused delays resulting in suspension of their work until May 1987. Extra erosion control work, performed by Sprinkler, was also a factor in the delays, and Sprinkler advised APAC and Southern it would seek additional compensation for this work as well. Plaintiffs also claim they incurred duration-related costs because of the delays.

The Project was completed in July 1987. In June 1988 APAC, acting on behalf of itself and on behalf of Sprinkler, submitted claims to Southern for additional payment for undercut work, extra erosion control work, and increased costs caused by the delays. In July 1988 Authority made its last payment to APAC, but withheld a retainage of $29,800 as liquidated damages. Authority did not include payment for APAC's additional claims.

Plaintiffs filed suit on 1 September 1989, alleging breach of contract for failure to pay the claims based on extra work. APAC requested $74,000 on its own behalf, and $226,000 on behalf of Sprinkler, summarily explaining that "APAC-Carolina is entitled to recovery [sic] for the benefit of United Sprinkler." APAC also claimed damages for losses and expenses incurred in performing corrective erosion control work arising from defective specifications provided by Authority. Finally, APAC alleged Southern's plans and specifications failed to disclose any quantities of undercut, replacement or compaction work, and that Southern concealed this information in its failure to exercise reasonable care or competence. APAC asserted that it and Sprinkler reasonably and foreseeably relied on the misrepresentations and concealments in preparing and submitting their bids. APAC claimed they were each damaged in excess of $10,000 on this count.

In its motion for summary judgment, Authority asserted: (1) APAC could not present claims on behalf of Sprinkler; (2) plaintiffs' claims were barred by contractual provisions; (3) the undercut work was properly paid for as unclassified excavation; (4)&(5) the quantities of undercut and other excavation were accurately measured; (6) plaintiffs' delay and suspension claim was barred by the contract; (7) there was no warranty regarding erosion control; and (8)&(9) the amount of an environmental fine was properly withheld as well as the amount of liquidated damages. Southern moved for summary judgment on the negligent misrepresentation claim. Finding no genuine issues of material fact, the trial court granted summary judgment for defendants on all issues.

· On appeal from the order of summary judgment in favor of defendants, plaintiffs assert: (1) APAC may present claims on behalf of Sprinkler; (2) questions of material fact exist concerning their claims against Authority; and (3) they have a cause of action against Southern for negligent misrepresentation.

---

At the outset, we note that summary judgment is only appropriate where there are no genuine issues of material fact. N.C.G.S. § 1A-1, Rule 56(c) (1990). After reviewing plaintiffs' arguments, we conclude that summary judgment was appropriately granted on several of the issues before us. However, we hold that summary judgment was improperly entered on the issue of the accuracy of the measurements of unclassified excavation. As discussed below, this issue affects the total amount owed to plaintiffs for their work, and may also affect the calculation of liquidated damages.

I.  Standing of APAC to Assert Claims of Sprinkler

[1]  In its first argument, APAC contends it has standing to assert claims on behalf of its subcontractor Sprinkler. It is undisputed that the subcontractor, Sprinkler, has no direct claim against Authority. There is no privity of contract, Sprinkler is not a third-party beneficiary of the contract between Authority and APAC, the contract was not assigned to Sprinkler, and no liens have been asserted by Sprinkler. Plaintiffs acknowledge the traditional rule that subcontractors have no action in their own right against owners due to the lack of privity between them. *See Warren Bros. Co. v. N.C. Dep't of Trans.*, 64 N.C. App. 598, 599, 307 S.E.2d 836, 838 (1983) (Court did not allow general contractor to bring claim on behalf of subcontractor when subcontractor itself could not bring

a claim against owner). However, plaintiffs assert that it is common practice for a contractor to present the claims of its subcontractor when suing another party to the contract. Plaintiffs cite the case of *Bolton Corp. v. T.A. Loving Co.*, 94 N.C. App. 392, 380 S.E.2d 796, *disc. rev. denied*, 325 N.C. 545, 385 S.E.2d 496 (1989) (hereafter *Bolton I*), as support for this proposition, stating that it allowed a contractor to recover from an owner its subcontractor's claim for services and costs. This is a misstatement of the holding of *Bolton I.*

*Bolton I* involved a multiple-prime contract to build a library at UNC-Chapel Hill. This type of contract is required by N.C.G.S. § 143-128 for public building projects with expected costs exceeding $50,000. N.C.G.S. § 143-128(a) (1990) (now $100,000). Section 143-128 makes each separate contractor directly liable to the State of North Carolina and to the other contractors. *Id.* The Court interpreted the statute to allow one prime contractor to sue another prime contractor for economic loss. Thus, Bolton, the heating and ventilating contractor, could sue Loving, the general contractor and "project expediter." 94 N.C. App. at 397, 380 S.E.2d at 800.

The Court also examined whether Bolton could introduce evidence of damages incurred by its subcontractor, Phillips. The Court noted that the contract makes each contractor responsible to other contractors for damages due to undue delay, and the contract makes each contractor responsible for the acts of its subcontractors. Thus, "one prime [contractor] on a multiple-prime project may sue another prime [contractor] for damages incurred by the first prime's subcontractor." *Id.* at 408, 380 S.E.2d at 806. This was the only relevant holding in that case. The *Bolton I* Court cited *Davidson & Jones v. N.C. Department of Administration*, 315 N.C. 144, 337 S.E.2d 463 (1985), but noted that the *Davidson* Court did not address the issue directly when it allowed a prime contractor to recover duration-related expenses *related to* work performed by a subcontractor. *Bolton I*, 94 N.C. App. at 408, 380 S.E.2d at 806. The Court in *Davidson* did not discuss standing, and there is nothing in that case indicating that the prime contractor was attempting to recover the expenses *on behalf of* the subcontractor.

Although not an issue in the case, the *Bolton I* Court commented in passing that several United States Supreme Court cases have allowed a contractor to recover from the owner its subcontrac-

tors' extra costs "when the subcontractor [was] not in privity with the owner and could not recover directly." 94 N.C. App. at 408, 380 S.E.2d at 806 (citing *United States v. Blair*, 321 U.S. 730, 737, 88 L. Ed. 1039, 1045 (1944), and *Hunt v. United States*, 257 U.S. 125, 128-29, 66 L. Ed. 163, 165 (1921) ). We note that this part of the opinion was dicta, and other decisions of the North Carolina Court of Appeals indicate this is not the law in North Carolina. *See Bolton Corp. v. State of North Carolina*, 95 N.C. App. 596, 383 S.E.2d 671 (1989), *disc. rev. denied*, 326 N.C. 47, 389 S.E.2d 85 (1990) (hereafter *"Bolton II"*); *Warren Bros. Co. v. N.C. Dep't of Trans.*, 64 N.C. App. 598, 307 S.E.2d 836 (1983).

In *Bolton II*, the Court did directly address whether Bolton could assert claims of its subcontractor Phillips against the State, and concluded that it could not. The State's sovereign immunity had only been waived as to those persons and corporations which had actually contracted with the State. *See* N.C.G.S. § 143-135.3(c) (1990) (allows those who have contracted with the State to file a claim against the State). Since Phillips did not have a contractual relationship with the State, its claim was barred by sovereign immunity. Thus, "because Phillips has no claim, Bolton Corp. has no claim on Phillips' behalf." 95 N.C. App. at 599, 383 S.E.2d at 673.

Any reliance by plaintiffs on the *Bolton* cases, therefore, is misplaced, because they are clearly distinguishable from the matter at hand. The contractual relationship in those cases was established and governed by a specific statute, which does not apply to the case now before us.

We note that section 80-01 of the contract in the case at hand specifically states that "[t]he owner will not recognize any subcontractor on the work." Similarly, in *Warren* the contract specifically stated, "nor will the Sub-contractor have any claim against the Commission (now NCDOT) by reason of the approval of the subcontract." 64 N.C. App. at 600, 307 S.E.2d at 838. The Court concluded, "[t]he contract in the instant case provides that plaintiff's subcontractor may not assert a claim against the defendant. The subcontractor may not do indirectly through plaintiff what it could not do directly by suit against the defendant." *Id.*

We conclude that APAC did not have standing to assert any claims on behalf of Sprinkler. Sprinkler had no claim against defendants on its own behalf. In both *Warren* and *Bolton II* the Court clearly stated that a general contractor may not assert a claim

on behalf of a subcontractor if that subcontractor could not assert the claim itself. Thus, APAC may not bring its claim of $226,000 on behalf of Sprinkler. We will address APAC's remaining claims for compensation to the extent that APAC raises these claims on its own behalf.

II. APAC's Claims Against Authority

A. Claims Based on Undercut Work

[2] APAC claims that the undercut work constituted "extra work" under the contract, and that it should receive additional compensation for such work. APAC concedes that it did not comply with that portion of the contract, Section 50-16, requiring written notice before the performance of extra work, but contends that this requirement was waived through subsequent parol agreement or conduct. *See Son-Shine Grading, Inc. v. ADC Constr. Co.*, 68 N.C. App. 417, 315 S.E.2d 346, *disc. rev. denied*, 312 N.C. 85, 321 S.E.2d 900 (1984). APAC relies on the fact that Authority, through Southern, was aware of the extra work and did not object to it. APAC agreed to perform the work at the direction of Southern, and informed Southern of its intention to seek additional compensation.

Authority asserts that the undercut work did not constitute "extra work" as defined in the contract. According to section 10-20 of the contract "extra work" is "[a]n item of work not provided for in the awarded contract . . . ." Section 40-04 states that "extra work" includes "an item of work for which no basis of payment has been provided . . . ."

As Authority points out, undercut work is clearly provided for in the contract. Item P-152, section 152-2.2(b), entitled "Undercutting," describes the materials included in this classification and sets forth the basis of payment for such work. According to that section, undercutting involves any "material unsatisfactory" for runway purposes. Such material must be excavated to "a minimum depth of 12 inches, or the depth specified by the Engineer, below the subgrade," and "[t]he excavated area shall be refilled with suitable material . . . and thoroughly compacted . . . ." Authority also references section 152-1.1 of the contract, which addresses unclassified excavation. According to that section unclassified excavation covers "excavation, disposal, placement, and compaction of all materials within the limits of the work required . . . ." Section 152-1.2 provides that "[u]nclassified excavation shall consist

of the excavation and disposal of all material, regardless of its nature." Authority points to page 4 of the construction plans, which contains the following:

> MATERIALS ENCOUNTERED DURING CONSTRUCTION THAT ARE DETERMINED BY THE ENGINEER TO BE UNSUITABLE FOR USE IN THE SUB-GRADE SHALL BE REMOVED BY THE CONTRACTOR AT THE DIRECTION OF THE ENGINEER. THE MATERIALS REMOVED WILL BE PAID FOR AT THE CONTRACT UNIT PRICE BID FOR 'UNCLASSIFIED EXCAVATION.' REPLACEMENT MATERIALS WILL BE CONSIDERED 'UNCLASSIFIED EXCAVATION' AND WILL BE PAID FOR AS SUCH.

Thus, the contract addresses undercut specifically and also treats it under the general heading of unclassified excavation.

Furthermore, the contract provides a basis of payment for undercut work. Section 152-2.2(b) states that "[t]his excavated material shall be paid for at the contract unit price per cubic yard for unclassified excavation."

We agree with Authority that the undercut work did not meet the definition of "extra work" under the contract. It is clear from the contract language that undercut work was to be treated as unclassified excavation and paid for as such. Thus, plaintiffs were entitled to $1.99 per cubic yard of undercut, the same rate as for all unclassified excavation. Because we find that the undercutting did not constitute extra work under the contract, we need not address the issue of plaintiff's compliance with Section 50-16 of the contract, the provision governing payment for extra work.

B. Differing Measurements

[3] APAC claims questions of material fact exist concerning the measurements of the amount of excavation work, including both undercut and non-undercut excavation, and that it is entitled to challenge the measurements under section 50-16 of the contract. Section 50-16 states that "[n]othing in this subsection shall be construed as a waiver of the contractor's right to dispute final payment based on differences in measurements or computations." One of the "key disputes," according to APAC, is the total amount of unclassified excavation. APAC estimates a total amount of over 183,000 cubic yards, but Authority contends the total was only about 164,000 cubic yards.

Authority points to section 152-3.4 of the contract, which stipulates that "[f]or payment specified by the cubic yard, measurement for all excavation shall be computed by the average end area method." Pursuant to this method, whenever an excavation hole was created in the undercut process, employees of APAC, Sprinkler, and the project engineer measured the length, width, and depth of the excavated areas. This information was then used to compute the quantity of material excavated. Authority maintains that these measurements were accurate. Brad Mills, Sprinkler's Vice President, stated he and Mr. Wayne Wilson, a project inspector for Southern, measured the excavation areas together. He stated he was not concerned about the accuracy of the final figures showed to him by Mr. Wilson, and that at the time everything seemed to be standard practice. He did point out, however, that Mr. Wilson did not always show him the figures being recorded. Mr. Mills understood that payment for the undercut work would be according to cross-section, the average end area method.

APAC, on the other hand, claims that Authority's measurements were inaccurate, thus rendering the average end area method of computation unreliable. Throughout the Project Sprinkler kept track of the amount of completed excavation using pan-load counts, and APAC now argues that a more accurate measurement would be obtained by using these load counts. In *W.E. Garrison Grading Co. v. Piracci Construction Co.*, 27 N.C. App. 725, 221 S.E.2d 512 (1975), *disc. rev. denied*, 289 N.C. 296, 222 S.E.2d 695 (1976), the Court allowed recovery based on pan-load counts, instead of the average end area method specified in the contract, due to errors in measurement. *Id.* at 730-31, 221 S.E.2d at 515-16. Accordingly, if APAC has presented evidence revealing errors in Authority's calculations, it should be able to present evidence of the measurements it obtained using the load count method.

We believe that APAC's evidence indicating potential errors in Authority's calculations is sufficient to raise a genuine issue of material fact regarding the measurements of the excavated material. Most significantly, APAC has produced an affidavit of an independent engineer and surveyor, Kenneth G. Simmons, analyzing the Project and methods of measurement used by Authority. In his report, submitted with accompanying exhibits and spanning 77 pages in the Record, Mr. Simmons carefully and extensively reviewed the measurements and concluded that many errors

existed. He felt that "several procedures and methods used by [Southern] cause apprehension and concern."

Mr. Simmons questioned, among other things, the small size of the scale used by Southern, its method of obtaining elevations, its use of benchmarks without establishing a control loop, and the elevation intervals used. The elevation problem itself "over the entire site would produce a huge volume of Excavation not paid to the grading contractor." Mr. Simmons concluded that "[i]n the absence of reliable cross-section data to measure quantities based on the average end-area method, it is practical to review the daily accounts of pan loads with an analysis of the average swell factor from cut to pan to arrive at cut volume for pay quantities."

We find that the information provided in Mr. Simmons' report was sufficient to create a genuine issue of material fact regarding the accuracy of Authority's measurements. We hold that summary judgment was inappropriately granted on this issue.

C.  Measure of Damages

APAC argues the trial court erred in applying the contract price, $1.99 per cubic yard, to their claims based on additional excavation and undercut work. APAC, alleging breach of contract in Authority's failure to pay for the additional work, claims entitlement to damages based on value and actual costs incurred in performing that work. APAC also claims quantum meruit recovery is appropriate when extra work has been performed.

Neither breach of contract nor the performance of extra work entitles APAC to quantum meruit recovery here. As Authority correctly points out, "[q]uantum meruit is an appropriate measure of damages only for breach of an implied contract, and no contract will be implied where an express contract covers the same subject matter." Industrial & Textile Piping, Inc. v. Industrial Rigging Servs., Inc., 69 N.C. App. 511, 515, 317 S.E.2d 47, 50, disc. rev. denied, 312 N.C. 83, 321 S.E.2d 895 (1984). Furthermore, we have already determined that the work performed did not constitute extra work under the contract. APAC is therefore entitled to $1.99 per cubic yard for the total amount of unclassified excavation. This amount will be calculated according to the measurement of the amount of unclassified excavation.

D.   Erosion Control Work: Breach of Warranty

[4]   APAC contends Authority breached an implied warranty by ordering APAC to perform extra erosion control work. APAC claims the State required the extra work as a result of Southern's failure to design adequate control measures. According to APAC, the plans and specifications furnished by Authority and Southern constituted warranties "that the work represented in the plans and specifications can be accomplished in the manner described." *See Gilbert Eng'g Co. v. City of Asheville*, 74 N.C. App. 350, 363, 328 S.E.2d 849, 857, *disc. rev. denied*, 314 N.C. 329, 333 S.E.2d 485 (1985) (if contractor has complied with plans and specifications prepared by owner, contractor not liable for consequences of defects in those plans and specifications); *Ray D. Lowder, Inc. v. N.C. State Highway Comm'n*, 26 N.C. App. 622, 638, 217 S.E.2d 682, 692, *cert. denied*, 288 N.C. 393, 218 S.E.2d 467 (1975) (contracting agency furnishing inaccurate information as basis for bids may be liable on breach of warranty theory). APAC contends the performance of any additional work entitles it to compensation for such work based on the breach of warranty theory if the plans were not suitable for the purpose for which they were intended. *See Gilbert*, 74 N.C. App. at 363, 328 S.E.2d at 857. Thus, APAC claims issues of material fact exist regarding whether or not extra work was caused by a breach of implied warranty.

Authority points to various provisions in the contract addressing erosion control and requiring compliance with environmental laws and regulations. Authority claims compliance was mandatory, and the burden of compliance was on the contractor.

According to section 70-19 of the contract, "[t]he contractor shall comply with all Federal, State, and local laws and regulations controlling pollution of the environment." A section of the contract entitled "Control of Erosion, Siltation and Pollution" (hereafter "Item CESP") addresses more fully the responsibilities of the contractor. Item CESP 1.1A states that the contractor

> shall take whatever measures are necessary to minimize soil erosion and siltation . . . . The Contractor shall also comply with the applicable regulations of all legally constituted authorities relating to pollution prevention and control. The Contractor shall keep himself fully informed of all such regulations which in any way affect the conduct of the work, and shall at all times observe and comply with all such regulations.

Furthermore, that section provides that "[i]n the event of conflict between such regulations and the requirements of the specifications, the more restrictive requirements shall apply."

We find no breach of implied warranty here. We agree with Authority that the quoted provisions require the contractor to comply with environmental laws and regulations, and that the burden of compliance rested completely on the contractor. Although the plans and specifications may have set forth environmental requirements, the contract clearly states that laws and regulations prevail. Furthermore, Item CESP 1.1D states that "[t]emporary and permanent erosion control measures shall be provided as shown on the plans or as directed by the engineer." Thus, Authority, through Southern, had contractual authority to direct APAC and Sprinkler to perform erosion control work not specified in the plans. Finally, we note that Item CESP 1.1I provides that the contractor is not entitled to any extra payment for the erosion control work. Such work was considered "incidental to the grading, excavation and embankment operation," and the cost was to be included in the unit price bid for excavation.

E. Delay and Suspension Claim

The no-damages-for-delay clause, found in section 80-06 of the contract, states:

> No provision of this article shall be construed as entitling the contractor to compensation for delays due to inclement weather, for suspensions made at the request of the contractor, or for any other delay provided for in the contract, plans, or specifications.

That section also provides, however, that the contractor may be reimbursed for actual costs incurred if "the contractor is ordered by the engineer, in writing, to suspend work for some unforeseen cause not otherwise provided for in the contract and over which the contractor has no control . . . ."

[5] APAC seeks damages for costs incurred during the suspension of work from November 1986 until May 1987, claiming that the delay was caused by the "unanticipated" undercut work and extra erosion control work. While acknowledging the no-damages-for-delay clause in the contract, APAC argues such clauses have been found unfair and unenforceable in other jurisdictions when the delay was not within the contemplation of the parties to the contract. *See*

*Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.*, 355 F. Supp. 376, 397 (S.D. Iowa 1973) (clause would be invalid if ambiguous, if delay not contemplated by parties, or if delay caused by bad faith or active interference); *M.D. Lundin Co. v. Board of Educ.*, 68 A.D.2d 881, 883, 414 N.Y.S.2d 34, 36 (1979). Thus, APAC urges that a jury should be instructed to consider whether or not to apply the clause in this case.

According to Authority, in December 1986 APAC requested a suspension of work beginning 8 November 1986 due to wet weather. Authority points out that no work had been done since 25 October 1986, and that work was in fact suspended until 14 May 1987 even though Authority did not formally grant the request. This delay does not fall within that portion of the contract allowing costs for unforeseen delays for two reasons. First, Authority did not order the delay, in writing or otherwise, and second, the delay was not due to "some unforeseen cause not otherwise provided for in the contract." Authority contends the undercut work was clearly provided for in the contract, and an inspection of the available information would have revealed the extent of necessary undercut work. Furthermore, delay due to wet weather is clearly precluded by the no-damages-for-delay clause.

We find the clause in the case at hand to be unambiguous and enforceable. APAC itself requested the suspension of work. Delays caused by wet weather were clearly foreseeable and not due to any action on the part of Authority.

F. Liquidated Damages

[6] The contract stipulates a contract time of 120 days, and specifically states that "[t]ime is important on this work and liquidated damages as specified will be enforced." Section 80-08 of the contract sets liquidated damages at $1,000 per day for failure to complete on time. APAC completed the project in 146 days, 26 days over the specified contract time, excluding the 180 days of suspension from November to March. Pursuant to this provision, Authority withheld $26,000 from its final payment to APAC.

APAC claims that liquidated damages cannot be assessed if the owner has contributed to the delay, *see Dickerson, Inc. v. Board of Transp.*, 26 N.C. App. 319, 321, 215 S.E.2d 870, 872 (1975), and that the amount assessed must be reasonable and non-punitive. *See First Value Homes, Inc. v. Morse*, 86 N.C. App. 613, 616,

359 S.E.2d 42, 43 (1987). According to APAC, Authority contributed to the delay by ordering extra work to be performed. Also, APAC claims extensions of time should be granted when unforeseen subsurface conditions are encountered as provided in section 80-07(a) of the contract. APAC claims genuine issues of material fact exist regarding the reasons for the delays and suspension in work.

We determined above that the undercut work did not constitute extra work under the contract. Thus, APAC did not contribute to the delay by ordering such work to be performed. Furthermore, Section 80-08 states that the "deducted sums shall not be deducted as a penalty but shall be considered as liquidation of a reasonable portion of damages that will be incurred by the owner should the contractor fail to complete the work in the time provided in his contract." APAC has not presented any evidence that the damages were unreasonable or punitive in nature. We find the liquidated damages clause to be valid and enforceable.

We cannot determine at this point, however, whether the actual amount of liquidated damages withheld was proper. Section 80-07(a) of the contract explains that the time for completion stated in the proposal is based on the originally estimated quantities. According to that section:

> "[s]hould the satisfactory completion of the contract require performance of work in greater quantities than those estimated in the proposal, the contract time shall be increased in the same proportion as the cost of the actually completed quantities bears to the cost of the originally estimated quantities in the proposal."

Thus, if the actual amount of unclassified excavation exceeded the proposal estimate, APAC would be entitled to a corresponding increase in contract time. We note that the proposal contained an estimate of over 167,000 cubic yards of unclassified excavation. APAC claims they removed over 183,000 cubic yards, but Authority claims that only about 164,000 cubic yards were excavated.

We have already determined to remand to the trial court on the issue of the measurement of excavation. Therefore, while we find the liquidated damages clause valid and enforceable, we must remand this issue as well since APAC may have been entitled to an increase in contract time.

III.　Summary Judgment for Southern

[7]　In their final argument plaintiffs contend the trial court erred in granting summary judgment for Southern on the issue of negligent misrepresentation. Plaintiffs allege that Southern failed to properly prepare plans, misrepresented the amount of necessary undercut work, and misled APAC and Sprinkler into believing that such work would not be significant. As plaintiffs point out, Sprinkler has standing to assert this claim, because privity is not necessary to bring an action for recovery in tort. See Howell v. Fisher, 49 N.C. App. 488, 494-95, 272 S.E.2d 19, 23-24 (1980), disc. rev. denied, 302 N.C. 218, 277 S.E.2d 69 (1981).

Justifiable reliance is an element of negligent misrepresentation in North Carolina. See Forbes v. Par Ten Group, Inc., 99 N.C. App. 587, 597, 394 S.E.2d 643, 648 (1990), disc. rev. denied, 328 N.C. 89, 402 S.E.2d 824 (1991). We conclude that any reliance by plaintiffs was not justifiable for several reasons. First, plaintiffs failed to adequately inspect available information. Second, the contract clearly stated that any quantities mentioned in the contract were merely estimates. Because an essential element of this tort is absent in this case, we find the trial court correctly granted summary judgment on this issue.

Plaintiffs claim Southern misrepresented the scope of the Project by failing to disclose any quantities of potential undercut, replacement and compaction work in the plans and specifications. Plaintiffs also point to Southern's responses to several inquiries about the extent of potential undercut work. According to the affidavit of I.B. Mills, Jr., President of Sprinkler, Mr. Mills inspected the Project site with Wayne Wilson of Southern either shortly before Sprinkler entered into the contract or shortly after 27 August 1986. In response to questions about the amount of potential undercutting, Mr. Wilson "created the clear impression that any undercutting on the project would be insignificant, not amounting to more than a couple of hundred cubic yards."

Southern responds that the plans clearly stated that any undercut would be treated as unclassified excavation. Since undercutting was included in the estimate for the total amount of unclassified excavation and was to be paid at the same price, Southern did not deem it necessary to list undercut separately. Furthermore, the boring logs and other subsurface investigation reports discussed the potential undercutting involved in the Project. Edward Stout,

a Southern employee, stated in his affidavit that reports prepared by Trigon Engineering Consultants, Inc., a soils testing consultant hired by Southern, revealed that some of the soil would be unsuitable and would need to be removed, replaced and compacted. The Engineer's Report prepared by Southern indicated that an area of the taxiway would have to be undercut and replaced, and that such work would be included in the category of unclassified excavation. Mr. Stout concluded that "a competent grading contractor would have and should have known that there would be undercut on this project had it reviewed all the documentation expressly made available to it and listed in the contract."

We note that section 20-06 of the contract places the burden of inspection upon the contractor. That section states that:

[t]he bidder is expected to carefully examine the site of the proposed work, the proposal, plans, specifications, and contract forms. He shall satisfy himself as to the character, quality, and quantities of work to be performed, materials to be furnished, and as to the requirements of the proposed contract. The submission of a proposal shall be prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the proposed contract, plans, and specifications.

Southern claims plaintiffs were negligent in not inspecting the available information, and that this contributory negligence bars their claim of negligent misrepresentation. *See Stanford v. Owens*, 76 N.C. App. 284, 287-88, 332 S.E.2d 730, 732-33, *disc. rev. denied*, 314 N.C. 670, 336 S.E.2d 402 (1985) (in reviewing directed verdict for defendants on issue of negligent misrepresentation, Court, viewing evidence in light most favorable to plaintiffs, declined to find plaintiffs contributorily negligent and decided that jury should determine the issue of negligent misrepresentation); *Calloway v. Wyatt*, 246 N.C. 129, 134-35, 97 S.E.2d 881, 885-86 (1957) (one cannot rely on representations if given the opportunity to inspect and failed to do so). The contract placed upon plaintiffs the burden of fully inspecting all of the available information, and the evidence indicates that this information would have revealed the necessity of undercut work. We find it unnecessary to determine whether plaintiffs were contributorily negligent since this evidence also shows

a lack of justifiable reliance, thereby defeating the claim of negligent misrepresentation.

The contract clearly states that any quantities therein are merely estimates. In *Thompson-Arthur Paving Co. v. N.C. Department of Transportation*, 97 N.C. App. 92, 387 S.E.2d 72, *disc. rev. denied*, 327 N.C. 145, 394 S.E.2d 186 (1990), this Court noted that quantities in bid proposals, which were clearly identified as estimates in contractual provisions, could not form a basis for a breach of warranty claim. *Id.* at 95, 387 S.E.2d at 74. Similarly, section 20-05 of the contract at hand states that:

> [t]he owner does not expressly or by implication agree that the actual quantities involved will correspond exactly therewith; nor shall the bidder plead misunderstanding or deception because of such estimates of quantities, or of the character, location, or other conditions pertaining to the work.

Following the reasoning of the Court in *Thompson-Arthur*, we find that the estimated quantities may not form a basis for a claim of negligent misrepresentation.

We conclude any reliance by plaintiffs was not justifiable in light of evidence that the plans and specifications discussed the potential undercut work, the contract addressed undercut work, plaintiffs did not fully inspect the available information, and the quantities stated in the contract were merely estimates. Furthermore, as Southern points out, APAC is a "multi-million dollar contractor," and it has performed other grading work at the airport in question. All of Southern's work for airport projects has been prepared in the same manner with regard to undercut, unclassified excavation, measurements, and method of payment. Thus, in the absence of justifiable reliance, plaintiffs may not assert their claim of negligent misrepresentation. The trial court correctly granted summary judgment on this issue.

We conclude that the trial court correctly granted summary judgment for defendants Authority and Southern on all issues except the accuracy of the measurements of the amount of excavation performed. Resolution of this issue will affect the total amount owed to APAC for excavation work, and as explained above, may affect the amount of liquidated damages Authority was permitted to retain.

## IN RE DISMISSAL OF HUANG

[110 N.C. App. 683 (1993)]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Judges WELLS and EAGLES concur.